# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00835-COA

IN THE GUARDIANSHIP OF T.N.W., A MINOR:         APPELLANT
FARRAH N. OWENS

v.

DYRENE OWENS AND DONALD OWENS         APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 03/06/2018 |
| TRIAL JUDGE: | HON. JENNIFER T. SCHLOEGEL |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | HARRY RAY LANE |
| ATTORNEY FOR APPELLEES: | RITA MARION SILIN |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | REVERSED AND REMANDED - 12/17/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE J. WILSON, P.J., TINDELL AND McDONALD, JJ.

### TINDELL, J., FOR THE COURT:

¶1. Dyrene and Donald Owens (the Owenses) filed a petition in the Harrison County Chancery Court, First Judicial District, for guardianship of their granddaughter T.N.W., hereafter referred to as Tiffany.[1] Following a hearing, the chancellor determined that clear and convincing evidence supported a finding that Farrah Owens, the Owenses' daughter and Tiffany's mother, had deserted Tiffany. The chancellor then conducted an *Albright* analysis[2]

---

[1] For privacy purposes, we substitute a fictitious name for the minor child and use the fictitious name throughout the opinion in lieu of initials.

[2] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

and concluded that third-party custody was in Tiffany's best interest. Farrah appeals the chancellor's judgment appointing the Owenses as Tiffany's guardians.

¶2. While placing Tiffany with her grandparents may very well have been in her best interest, we conclude that insufficient evidence supported the chancellor's finding of desertion. Because we reverse the chancellor's judgment on this ground, we decline to address Farrah's remaining assignments of error. We remand this case for further proceedings so the chancellor may determine under what basis, if any, the Owenses' guardianship of Tiffany should continue and, if so, what visitation rights Farrah should receive.

**FACTS**

¶3. In December 2016, when Tiffany was two months old, Farrah and Tiffany moved to Gulfport, Mississippi, to live with the Owenses. On February 9, 2017, when Tiffany was four months old, the Owenses filed a petition seeking an emergency order naming them as Tiffany's guardians. On the same date, the chancellor entered an ex parte order granting the Owenses temporary legal and physical custody of Tiffany. On February 20, 2017, the chancellor entered a temporary custody order that continued to grant the Owenses temporary legal and physical custody of Tiffany but also granted Farrah reasonable visitation with Tiffany by mutual agreement with the Owenses.

¶4. In November 2017, the chancellor held a two-day hearing on the Owenses' guardianship petition. On March 6, 2018, the chancellor entered an order appointing the Owenses as Tiffany's guardians. The chancellor found that "Farrah's long and continuous

absences, her failure to exercise her parental rights, and her failure to fulfill her parental responsibilities" provided a sufficient evidentiary basis for desertion. The chancellor then considered the *Albright* factors and determined that all but one of the factors favored the Owenses.[3] After concluding that it was in Tiffany's best interest to remain with the Owenses, the chancellor appointed them as Tiffany's guardians, stated that they could claim Tiffany as a dependent for income-tax purposes, and ordered Farrah to pay the Owenses $157 a month in child support until Tiffany reached the age of twenty-one or became emancipated. Aggrieved, Farrah appeals.

## DISCUSSION

¶5.     "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard." *Neely v. Welch*, 194 So. 3d 149, 155 (¶18) (Miss. Ct. App. 2015). Where substantial evidence supports the chancellor's findings of fact, this Court must not reweigh the evidence but must instead defer to the chancellor's findings. *Id.*

¶6.     In child-custody cases, the best interest of the child is the paramount concern. *Burge v. Burge*, 223 So. 3d 888, 899 (¶37) (Miss. Ct. App. 2017). "In custody battles between a natural parent and a third party, it is presumed that it is in the child's best interest to remain with his or her natural parent." *Id.* (quoting *Smith v. Smith*, 97 So. 3d 43, 46 (¶8) (Miss. 2012)). Thus, a "third party must first clearly rebut the natural-parent presumption or preference" to receive custody. *Smith*, 97 So. 3d at 46 (¶8). As our caselaw establishes:

---

[3] The chancellor found that the factor considering a child's preference was inapplicable since Tiffany was not yet twelve years of age or older.

3

> [T]he natural-parent presumption may only be rebutted by clear and convincing evidence that (1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody.

*In re Waites*, 152 So. 3d 306, 311 (¶14) (Miss. 2014) (internal quotation marks omitted). Where a third party successfully rebuts the presumption, the chancellor must conduct an *Albright* analysis to determine if third-party custody serves the child's best interest. *Smith*, 97 So. 3d at 46 (¶8).

¶7.     Here, the chancellor concluded that clear and convincing evidence demonstrated Farrah had deserted Tiffany. "Desertion is defined as for[]saking one's duty as well as a breaking away from or breaking off associations with some matter involving a legal or moral obligation or some object of loyalty . . . ." *Neely*, 194 So. 3d at 156 (¶21) (internal quotation mark omitted); *see also Smith*, 97 So. 3d at 48 (¶16) (explaining that desertion occurs when one forsakes "a person, institution, cause, etc., having a moral or legal claim upon one" or "forsake[s] one's duty, one's post[,] or one's party").

¶8.     In *Smith*, the Mississippi Supreme Court considered a chancellor's award of primary physical custody of a minor boy to his maternal grandmother and step-grandfather. *Smith*, 97 So. 3d at 44 (¶1). The *Smith* court concluded the record supported the chancellor's finding that the mother's desertion of her son had overcome the natural-parent presumption. *Id.* at 49 (¶17). Following the son's birth in June 2003, he and his mother lived with the maternal grandparents in Mississippi. *Id.* at 45 (¶3). Over the next three years, the mother attended college. *Id.* The mother "sometimes visited" her son on weekends during the first

4

three years of his life, but her visits eventually grew more infrequent. *Id.* In April 2006, the mother got married and moved to Washington D.C. to live with her new husband. *Id.* About a month later, the son also moved to Washington D.C. to live with his mother and her new husband. *Id.* In June 2006, however, the mother and her new husband separated, and the son returned to Mississippi. *Id.* Over the next few months, the son spent time in both Washington D.C. and Mississippi until he permanently returned to Mississippi in November 2006. *Id.* In 2007, the mother "sporadically" visited her son in Mississippi, and in April or May 2007, she gave the grandparents medical guardianship over her son. *Id.* In 2008, the mother's visits with her son continued to grow "more infrequent," and in March 2009, she moved to Arizona with a man she later married. *Id.* In granting third-party custody to the grandparents, the chancellor in *Smith* stated that the mother "had 'failed to exercise her parental rights and fulfill her parental responsibilities' by her 'long and continuous absences' from . . . [her son]. Consequently, the Smiths [(the grandparents)] had raised . . . [the grandson] virtually his entire life . . . ." *Id.* at 46 (¶4).

¶9. Citing *Smith*, the chancellor in the present case found that Farrah's actions also constituted desertion. Specifically, the chancellor here stated:

> Farrah's long and continuous absences, especially in the context of a baby as young as the one in the instant case, along with her [(Farrah's)] failure to exercise her parental rights, failure to financially support and care for the child[,] and her failure to fulfill her parental responsibilities, caused the child's grandparents [(the Owenses)] to step in as primary caretakers.

¶10. Upon review, however, we conclude that the record in the present case fails to support a finding of desertion by clear and convincing evidence. At the time the Owenses filed their

February 9, 2017 emergency petition for guardianship, Tiffany was only four months old and had only lived in the Owenses' home for two months. In addition, evidence reflected that until the Owenses received temporary custody of Tiffany, Farrah had been constantly present in her daughter's life and had consistently contributed to Tiffany's care and well being.

¶11.     When the chancellor held the two-day hearing in November 2017 on the Owenses' guardianship petition, Tiffany was one year old. Farrah testified about how often she had visited her daughter since her parents had received custody of Tiffany eight months earlier. Farrah stated that her parents initially allowed her to move back to their house following the February 2017 court hearing until they kicked her out a few weeks later. After leaving her parents' home, Farrah stated that she visited with Tiffany around twenty times before she again moved back into her parents' home in August 2017. During the time she lived with her parents in August 2017, Farrah testified that she was able to see Tiffany on a daily basis and that she "took care of Tiffany the whole time . . . [she] was there . . . ." According to Farrah, she was the one who mostly "fed . . . [Tiffany], bathed her, put her to bed, [and] fixed her breakfast."

¶12.     Farrah stated that her parents once again kicked her out of their home in September 2017 after they learned she had hired an attorney to represent her in the guardianship proceedings. Farrah testified that she still tried to visit Tiffany but that her parents refused to let her visit their house during weekdays while her father was at work. As a result, Farrah stated that she only visited with Tiffany once in the month leading up to the November 2017 hearing. Farrah also stated that she constantly tried to call and text her parents to request

phone visits with Tiffany and pictures and videos of Tiffany. Farrah claimed, however, that her parents usually failed to answer her phone calls and text messages.

¶13. Farrah also testified that in September 2017 she obtained a job at a produce and firewood business. Farrah stated that she worked at the business the first part of the day and then babysat her bosses' four children in the afternoons. Farrah testified that she had secured housing for herself and Tiffany and that she had just finished decorating Tiffany's bedroom. If granted custody of Tiffany, Farrah testified that her employers had agreed to allow her to take Tiffany to work with her.

¶14. Unlike in *Smith*, the present record fails to show that Farrah forsook her duty to Tiffany through "long and continuous absences," a "failure to exercise her parental rights," or a "failure to fulfill her parental responsibilities." *See Smith*, 97 So. 3d at 48 (¶16). Evidence instead reflected that Farrah consistently was or attempted to be present over the first year of Tiffany's life. The record also contained evidence that during the periods when Farrah lived under the same roof as Tiffany, she helped to care for Tiffany and to provide for Tiffany's needs. And during the times when she did not live under the same roof as Tiffany, Farrah testified about her repeated attempts to visit with her daughter. In addition, by the time of the November hearing, Farrah had not only obtained a job to financially support herself and Tiffany but had also obtained housing and arranged childcare. Based on such evidence, we conclude the chancellor manifestly erred by finding that the Owenses rebutted the natural-parent presumption with clear and convincing proof of desertion.

**CONCLUSION**

7

¶15. Because we find clear and convincing evidence failed to support the chancellor's determination of desertion, we reverse the grant of guardianship to the Owenses. We remand this case for further proceedings so the chancellor may determine under what basis, if any, the guardianship should continue and, if so, what visitation rights Farrah should receive.

¶16. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR. LAWRENCE, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**